A95A2537. TRANAKOS v. MILLER et al.
(470 SE2d 440)

ANDREWS, Judge.

The underlying action was filed in December 1986 and has meandered through the legal system ever since. John and Rachel Miller sued Arthur P. Tranakos individually and d/b/a The Snuggery, Inc., claiming breach of contract, fraud, deceit, legal malpractice, breach of fiduciary responsibilities, cancellation of promissory notes, and violation of Georgia's Racketeer Influenced and Corrupt Organizations Act. The Millers later amended their complaint to include the Tranakos Grandchildren Trust as a defendant. The Millers' case was consolidated with a related case brought by William R. Murray, Ken Ramsey, Mike Roberts, and Leola and Donald Haugh.

After protracted litigation including multiple appeals, the case appeared to be finally resolved by March 1, 1994, the scheduled day of trial. Opposing counsel, in a conference call, allegedly jointly informed the trial judge's calendar clerk (actually her substitute, a floating calendar clerk) that the case was settled. It is undisputed that

the attorneys participated in a three-way telephone conference call with the calendar clerk. According to the terms, Tranakos agreed to pay a total of $1,250,000, $250,000 to each party and consented to judgment against him as to each count. The oral settlement agreement was not memorialized that day and subsequently unravelled. John Miller, the estate of Rachel Miller, William R. Murray, Ken Ramsey, Mike Roberts, and Leola and Donald Haugh (collectively "Miller") then filed a second motion to enforce the settlement agreement.[1]

In support of the motion to enforce the settlement, Miller's attorney, Robert Moss, filed his own affidavit, attached the transcripts of four recorded telephone conversations with Michael D. Bolen, Tranakos' attorney and submitted the actual tape recordings to the clerk of the court for filing. Robert Moss made these recordings without Bolen's knowledge or permission.

According to the transcript of April 19, 1994, Tranakos' counsel did not dispute that there had been an agreement or that Tranakos had agreed to pay each claimant $250,000. Bolen advised opposing counsel, Moss, there was, however, a problem with the agreement because Tranakos had decided to strike the language whereby he consented to judgment on the specific counts. According to Bolen, Tranakos had retyped the agreement just omitting that section and had already mailed it to Moss.

According to the transcript of May 3, 1994, Bolen failed to contradict or disagree with Moss's statement, "[W]e agreed on the agreement, we mentioned it to the Clerk, we agreed on the amount and we agreed it was for all counts." Moss warned Bolen that he had just finished dictating a motion to enforce the settlement agreement.

According to the transcript of June 13, 1994, Bolen again admitted they had spoken with the judge's calendar clerk, that he had been acting for Tranakos and that they told the clerk the terms of the consent judgment. Bolen explained that Tranakos had experienced a "change of heart" and was now "fussing about" the amounts.

According to the transcript of June 15, 1994, Bolen stated that he thought he had Tranakos' authority when he agreed to the consent judgment. Bolen told Moss he had discussed the settlement with Tranakos and Tranakos told him he had authority to make the phone call. Bolen also stated that it was his understanding that Tranakos had agreed to the $250,000 per plaintiff amount.

In opposition to Miller's motion, Tranakos filed his affidavit and that of his attorney, Michael D. Bolen, and a letter from Moss to Bo-

---

[1] The motion to enforce settlement agreement, which is an unofficial copy, not file-stamped, does not show John Miller or the estate of Rachel Miller as parties to the filing of the motion.

len dated February 7, 1994. Tranakos claimed that there was no settlement agreement and that this situation was analogous to that of November 1991 when Miller filed the first motion to enforce settlement. That time, the same trial court judge refused to grant the motion to enforce settlement because he concluded there was a conflict as to whether there was a settlement agreement. Tranakos claimed that Bolen had only limited authority and could not bind him unless he provided his express, written consent. Tranakos also testified that because of Bolen's ill health, he refrained from contacting Bolen and was unaware of the settlement discussions until he received a copy of the proposed consent judgment which he deemed unacceptable. Tranakos testified that Moss knew that any settlement was expressly subject to Tranakos' prior approval.

In his affidavit, Bolen testified that neither he nor his client had authorized a settlement and that there had never been a final settlement agreed to by all the parties. He testified that Moss was fully aware that Tranakos had to approve any settlement agreement. Bolen also claimed that during the January and February settlement discussions he had been gravely ill, could not meet with Tranakos, and was confused as to the state of these negotiations. Finally, Bolen testified that Tranakos had not authorized him to enter into any settlement.

On July 18, 1994, the trial court entered an order to enforce the settlement agreement, and signed a consent judgment in favor of the plaintiffs and against Tranakos as to each count. The court entered judgment for $250,000 for each claimant and awarded post-judgment interest. Implicit in the court's enforcement order are findings that: 1) Bolen was authorized to settle the case; 2) an enforceable settlement agreement was reached; and 3) Bolen was competent at the time the settlement negotiations were reached.

On August 17, 1994, Tranakos filed a motion for a new trial. In denying the motion, the court deemed it to be a motion for reconsideration of the court's order granting plaintiffs' second motion to enforce the settlement agreement. In a later order denying Miller's motion to dismiss notice of appeal, the court corrected itself and noted that the motion for new trial should not have been construed as a motion for reconsideration because the court made a factual determination of whether Tranakos' attorney was competent. The court concluded that Tranakos' notice of appeal was timely as being based on the court's denial of a motion for new trial.

1. Tranakos contends that the trial court erred in ruling that there was a settlement agreement between the attorneys which was binding on him. Tranakos claims that he made it expressly clear to opposing counsel that he personally would have to provide consent to any agreement. He argues that because he did not consent, there was no agreement.

"Factual findings made by the trial court will not be set aside unless clearly erroneous. *Mutual Ins. Co. of New York v. Dublin Pub*, 190 Ga. App. 94, 95 (378 SE2d 497) (1989)." *Johnson v. Gwinnett County*, 215 Ga. App. 79, 81 (449 SE2d 856) (1994). With that in mind, we consider the evidence.

Tranakos states that on July 18, 1994, the trial court held a "non-evidentiary hearing." We note that Tranakos failed to sustain his burden of having a transcript of the hearing sent for appellate review. *Young v. First American Bank &c.*, 196 Ga. App. 348 (396 SE2d 73) (1990). Lacking a transcript of the hearing, we presume the judge correctly ruled on the issues presented. *Attwell v. Heritage Bank Mt. Pleasant*, 161 Ga. App. 193 (291 SE2d 28) (1982). The record evidence includes the affidavits of Tranakos, his counsel and opposing counsel. Additionally, the trial court noted that in making its determination as to whether there was a settlement agreement, it considered the entire record.

The record includes the following. While this case was pending, Tranakos devolved from a licensed, practicing attorney to a convicted felon. Particularly pertinent is evidence relating to Tranakos' truthfulness and obstructionism. Several months before the filing of the instant action, the United States Tax Court suspended Tranakos from further practice before it for two years from February 7, 1986. In the accompanying memorandum to the federal tax court's suspension order, the panel noted that Tranakos offered into evidence "a document falsely appearing to be a corrected Form W-2," that "he knew not to be what it appeared on its face to be" and termed this "an inexcusable misleading of the Court." In addition to other findings of wrongdoing, the panel determined that Tranakos had "specifically misrepresented the facts with respect to the filing" of a particular case.

At about the two-year point in the underlying litigation, Tranakos was convicted in the United States District Court of Wyoming for conspiracy to commit fraud, obstruction of justice, and aiding and assisting in counseling, procuring, and advising the preparation of false tax returns. On March 3, 1989, the district court sentenced Tranakos to serve four years with an additional five years on probation.

Prior to his federal conviction, Tranakos was held in contempt of court and confined for about one week to a federal penitentiary for contempt for his refusal to comply with an Internal Revenue subpoena. During the pendency of this litigation, on multiple occasions, the previous trial court[2] sanctioned Tranakos holding him in con-

---

[2] Judge William Daniel originally had this case from 1986 until he recused himself on

tempt of court for his wilful failure to comply with discovery. In his deposition taken for this case, Tranakos admitted that on the advice of his attorney he had surrendered his license to practice law in Georgia.

In this case, acting as the trier of fact, the trial court sorted through the facts, the affidavits and counter-affidavits, and other evidence in the record and concluded that Tranakos' attorney was competent, there had been a settlement agreement and it was binding on Tranakos. The record shows Tranakos' credibility was undercut by his federal conviction for fraud including assisting in the preparation of false tax returns and his suspension from federal tax court practice for, inter alia, making serious misrepresentations to the tax court. Tranakos' attorney's credibility was undercut by the transcripts of the four recorded telephone conversations. Having reviewed relevant portions of the record and transcript, we cannot say the trial court's factual findings were clearly erroneous. *Johnson*, 215 Ga. App. at 81. Accordingly, the trial court correctly determined that there was a settlement agreement.

Having decided that there was an oral settlement agreement, we must next determine whether that oral agreement was enforceable under the circumstances here. Oral settlement agreements made between counsel, if established, are enforceable. Here, the tape transcripts demonstrate there was an agreement as to all the counts and a sum certain for each claimant. See *Crystal Cubes &c. v. Kutz*, 201 Ga. App. 338, 340 (3) (411 SE2d 53) (1991) (holding confirming letters between attorneys sufficient to show settlement agreement); see generally *LeCroy v. Massey*, 185 Ga. App. 828 (366 SE2d 215) (1988) (holding where existence of agreement contested, absence of writing prevents its enforcement). Generally, where the very existence of the settlement agreement is disputed, it may be established only by a writing. Id. at 829. Here, the written transcripts satisfy the writing requirement by providing certainty and finality as to the exact terms of the agreement. *Kutz*, 201 Ga. App. at 340.

" 'Verdicts and judgments rendered by consent of counsel in good faith and without any fraud or violation of express instructions given by the client to the attorney and known to the adverse party or his attorney are binding upon the client, the consent of counsel being in law the consent of the parties they represent.' (Cits.)" *Phoenix Properties &c. v. Umstead*, 245 Ga. 172 (264 SE2d 8) (1980). See OCGA § 15-19-5 and Uniform Superior Court Rule 4.12.

In this case, when Bolen acted on Tranakos' behalf he believed he had received settlement authority from Tranakos and as he later

---

March 2, 1989, and it was apparently reassigned to Judge Isaac Jenrette.

told Moss, he had been in telephone contact with his client. The fact that Tranakos later had a change of heart is irrelevant as to whether on March 1, 1994, Bolen had settlement authority. Tranakos has offered no evidence that the opposing parties or their counsel were made aware that at the time of the settlement telephone call to the calendar clerk, his attorney, although exercising settlement authority, lacked that authority. "[F]rom the perspective of the opposing party, in the absence of knowledge of express restrictions on an attorney's authority, the opposing party may deal with the attorney as if with the client, and the client will be bound by the acts of his attorney within the scope of his apparent authority. The client's remedy, where there have been restrictions not communicated to the opposing party, is against the attorney who overstepped the bounds of his agency, not against the third party." *Brumbelow v. Northern Propane Gas Co.*, 251 Ga. 674, 675 (308 SE2d 544) (1983).

2. Tranakos' contention that the trial court erred in ruling that his motion for new trial was actually a motion for reconsideration was rendered moot by the trial court's order of March 1, 1995, wherein the court corrected itself and concluded that motion was, in fact, a motion for new trial. Also, we deny Miller's motion to dismiss appeal, having found Tranakos' appeal of this case was timely under OCGA § 5-6-38 (a).

3. As to the final two enumerations of error, Tranakos fails to support them with argument, authority, and citation to the record. Consequently, to the extent that these enumerations are not disposed of by our holdings in Divisions 1 and 2, they are deemed abandoned. *Pappas v. Southeast Universal Dev.*, 202 Ga. App. 627, 628 (4) (415 SE2d 190) (1992); Court of Appeals Rule 27 (c) (2) and (3).

*Judgment affirmed. McMurray, P. J., and Blackburn, J., concur.*

DECIDED MARCH 1, 1996 —
RECONSIDERATION DENIED MARCH 27, 1996 —

*Graydon W. Florence, Jr.*, for appellant.
*Moss & Rothenberg, Robert A. Moss*, for appellees.